# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GABRIEL DIEGO BETANCOURT,<br><br>  Petitioner,<br><br>  v.<br><br>JAMES HARTLEY,<br><br>  Respondent. | 1:09-CV-1140 AWI JMD HC<br><br>FINDINGS AND RECOMMENDATIONS REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br>OBJECTIONS DUE WITHIN THIRTY (30) DAYS |

Gabriel Diego Betancourt (hereinafter "Petitioner") is a prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a 1993 conviction for second-degree murder. The trial court sentenced Petitioner to a prison term of fifteen years to life. On August 8, 2007 the California Board of Parole Hearings ("Board") conducted a hearing and denied Petitioner parole. See Board Transcript ("Transcript") at 66.[1] Petitioner filed habeas petitions challenging the Board's denial of parole in all three levels of the California courts. On November 18, 2008, the Fresno County Superior Court denied Petitioner's state habeas petition. See Respondent's Exhibit 2. The California Court of Appeal and the California Supreme Court issued summary denials of Petitioner's claim. On June 30, 2009, Petitioner filed the instant federal petition for writ of habeas corpus challenging the Board's

---

[1] The transcript of the parole hearing is listed as Petition Exhibit A.

denial of parole.  See Doc. No. 1.  On July 26, 2010, Respondent filed a response to the petition. See Doc. No. 15.  On September 22, 2010, Petitioner filed a traverse.  See Doc. No. 18.

## FACTUAL BACKGROUND

The Board summarized the facts as follows:[2]

On November 26, 1992, Javier J-A-V-I-E-R Juan J-U-A-N Mondragon M-O-N-D-R-A-G-O-N was residing in apartment one located at 243 North Blackstone Street in Fresno, California.  Also living there was another couple, Germain and Virginia Martinez and Javier's cousin, Cuauhtemoc... C-U-A-U-H-T-E-M-O-C Mondragon Perez, age 35, and his cousin's wife and their children.  It was Thanksgiving and Javier and his relatives at the apartment went to have Thanksgiving dinner at the residence belonging to Jose Pilar P-I-L-A-R and his wife, who is Cuauhtemoc's sister.  During the early evening hours, Javier left the home and returned to the apartment on North Blackstone Street.  When he arrived Juventino J-U-V-E-N-T-I-N-O Benitez B-E-N-I-T-E-Z, who he refers to as Tino T-I-N-O, was going into his apartment number two at the same location, invited Javier to have some beers with him in his apartment.  Javier went into the apartment with Tino.  The [Petitioner] was there and listened as they conversed.  He joined in the conversation and also drank beer with Javier and Tino.  While at the apartment, Javier saw a 9-mm handgun on the table and picked it up. He remarked to Tino, 'your gun is pretty.'  At this time, they also talked about Tino's wife, who was no longer living with him.  After a lapse of approximately 25 minutes, all of them went to Javier's apartment because Germain and Virgina had invited them to come over for dinner.  While there, Javier only took a sip from a beer because he had to take a bath and return to Jose Pilar's residence, where his relatives were waiting for him.  In the meantime, he had also purchased some tortillas and was there to take them with him to Pilar's home. When Javier was leaving, he encountered the [Petitioner] outside.  He told Javier that he wanted to talk to him and asked him where he was going.  The [Petitioner] then made some remark to the effect implying that Javier was going out with Tino's wife.  Tino and his wife were separated at the time.  During his testimony, Javier recollected that on one occasion, he had given Tino's wife a ride to her residence.  On this occasion, she had asked Javier's cousin, Cuauhtemoc, to take her home and Cuauhtemoc asked Javier to do this.  Tino's wife told Javier that [Petitioner] wanted to take her home, but she didn't want that.  While en route, Javier stopped at a nearby business that sells hamburgers because his car was acting up.  At this time, they observed the [Petitioner] parked in his vehicle in the parking lot. Tino's wife noticed this and made a statement indicating that she did not want the [Petitioner] to see her.  In any event, an argument ensued during which Javier and the [Petitioner] pushed one another and also swung at each other but missed.  Javier subsequently left after making a remark to the [Petitioner].  Javier remembered that he had left the tortillas behind and returned in his vehicle to the apartment to retrieve them.  Tino and the [Petitioner] were on the stairs and Tino asked Javier why they had fought.  The [Petitioner] told Tino that it was about his wife.  The [Petitioner] swung at Javier who then pushed him.  A fight ensued during which Tino also became involved.  At this time, all of them were fighting on the porch and fell.  Javier recollected that towards the end of the fight, Tino indicated that he did not want to fight any more and embraced him.  He then led him up the stairs.  In the meantime, Jose Pilar gave his brother-in-law Cuauhtemoc and Cuauhtemoc's wife and their four children a ride to the apartment on North Blackstone Street because Javier had not returned with the car.  Also in the vehicle was Jose's wife, Gregora G-R-E-G-O-R-A, Cuauhtemoc's sister.  As they arrived, they observed Javier struggling with the [Petitioner] and Tino.

---

[2] The Board derived the facts from the transcript of the Petitioner's Preliminary Hearing, which was held at the Fresno County Municipal Court on January 5, 1993 and from the Fresno Police Department crime report.  See Transcript at 17.

Cuauhtemoc and his sister got out of the vehicle while it was still moving and proceeded to the scene. Jose went to park the car. Javier heard Cuauhtemoc yell to be careful. At this time, he observed the [Petitioner] coming from Tino's apartment with the gun in his right hand. He fired three shots, Cuauhtemoc fell and Javier did not realize he had been shot until he took one step and fell backwards. He intended to make the effort to take the gun away from the [Petitioner] prior to falling. Gregora commenced struggling with the [Petitioner] for the gun. She grabbed his arm and held on. Gregora managed to knock the gun out of the [Petitioner's] hand. Tino picked it up and handed it back to the [Petitioner]. Both of them then proceeded into the apartment. Jose Pilar also testified that after he parked the car, he took Cuauhtemoc's little boy with him. He then saw Javier and the [Petitioner] lunging at each other. At one point, the [Petitioner] knocked Javier down and that is when he... shot Cuauhtemoc who had been struggling with Tino. Also while struggling with Jose's wife, the [Petitioner] also shot at Jose but missed. At this time, the little boy had already fled and ... was hiding and Jose was attempting to take cover. All of Cuauhtemoc's children witnessed their father being shot. Approximately 8:55 p.m. Fresno Police Department officers were dispatched to the scene. Cuauhtemoc was lying face down in the south side of the sidewalk in front of the steps, and he was being held by his sister. He had sustained two gunshot wounds, one to the left chest area, the other one to the right shoulder. The victim was transported . . . by ambulance to the hospital, where he was pronounced dead at 9:16 p.m. Autopsy later determined he died as a result of a gunshot wound to the heart. Javier was lying several feet north of Cuauhtemoc. He had sustained a gunshot wound to the upper left shoulder area. Javier was transported by ambulance to the hospital, where he remained for two weeks. Officers obtained consent from Juventino Benitez to search apartment number two. The [Petitioner] was not there. Also, the 9-millimeter belonging to Juventino was missing. Three expended 9-millimeter shell casings were recovered from the porch. Another 9-millimeter expended bullet was located the following day on the street. It appeared that the bullet had ricocheted from a hard surface. November 27, 1992, shortly before 1:00 a.m., two Fresno police department officers spotted the [Petitioner] walking in the vicinity of Barton and Grant Streets, took him into custody. He was transported to Valley Medical Center, where a blood sample was obtained. Afterwards the [Petitioner] was transported to Fresno Police Department, where he was interviewed by Officer Mange M-A-N-G-E. After being advised of his rights and waiving them, he gave a statement denying any responsibility for the crime. The [Petitioner] was questioned later and indicated that he did not remember shooting the victim. After the [Petitioner's] arrest, an officer found a loaded 9-millimeter handgun under the left floorboard of the patrol unit used to transport the [Petitioner]. It had six rounds, one of the bullets had an indentation mark on the primer as the [Petitioner] misfired. Officer Mange also interviewed Cuauhtemoc's wife. She indicated that after the initial shooting when the [Petitioner] and Tino were returning to their apartment, the [Petitioner] stopped at the top of the stairs, turned, fired one shot at Jose Pilar.

See Transcript at 17-24.

The Board's Decision

The Board determined that Petitioner posed an unreasonable risk to public safety for a number of reasons, including the following: (1) Petitioner's commitment offense was carried out in an especially cruel and very callous manner as multiple victims were attacked and injured; (2) Petitioner's prior criminal history, which involved a number of alcohol-related offenses and previous failed grants of probation; (3) Petitioner's serious disciplinary issues, which included a 115 violation in 2001 for manufacturing and possessing a stabbing instrument; (4) Petitioner's insufficient

participation in substance abuse treatment; and (5) Petitioner's lack of insight into the causative factors of the crime.  See Transcript at 66-76.

## DISCUSSION

### I. Jurisdiction

A person in custody pursuant to the judgment of a State court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000).  Petitioner asserts that she suffered violations of his rights as guaranteed by the United States Constitution.  Petitioner is currently incarcerated at Avenal State Prison, which is located in Kings County.  As Kings County falls within this judicial district, 28 U.S.C. § 84(b), the Court has jurisdiction over Petitioner's application for writ of habeas corpus.  See 28 U.S.C. § 2241(d) (vesting concurrent jurisdiction over application for writ of habeas corpus to the district court where the petitioner is currently in custody or the district court in which a State court convicted and sentenced Petitioner if the State "contains two or more Federal judicial districts").

### II. Standard of Review

On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's enactment.  Lindh v. Murphy, 521 U.S. 320, 326-27 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997).  The instant petition was filed after the enactment of AEDPA and is consequently governed by its provisions.  See Lockyer v. Andrade, 538 U.S. 63, 70 (2003).  The petition "may be granted only if [Petitioner] demonstrates that the state court decision denying relief was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'"  Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1)), overruled in part on other grounds, Hayward v. Marshall, 603 F.3d 546, 555 (9th Cir. 2010) (en banc); see Lockyer, 538 U.S. at 70-71.

Title 28 of the United States Code, section 2254 remains the exclusive vehicle for Petitioner's habeas petition as Petitioner is in the custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment.  See Sass v. California Board of

Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006) overruled in part on other grounds, Hayward, 603 F.3d at 555.  As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  Id. (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)).  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Id.  Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law."  Id. at 72 (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.  "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the State court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

Petitioner bears the burden of establishing that the state court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent.  Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable.  Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While *only* the Supreme Court's precedents are binding on the Arizona court, and only those precedents

need be reasonably applied, we may look for guidance to circuit precedents"); <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th Cir. 1999) ("because of the 1996 AEDPA amendments, it can no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on a federal Constitutional issue....This does not mean that Ninth Circuit case law is never relevant to a habeas case after AEDPA. Our cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established'"). Furthermore, the AEDPA requires that the Court give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). A federal habeas court is bound by a state's interpretation of its own laws. <u>Souch v. Schaivo</u>, 289 F.3d 616, 621 (9th Cir. 2002).

The initial step in applying AEDPA's standards is to "identify the state court decision that is appropriate for our review." <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091 (9th Cir. 2005). Where more than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the last reasoned decision. <u>Id.</u> (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991)). Thus, a federal habeas court looks through ambiguous or unexplained state court decisions to the last reasoned decision to determine whether that decision was contrary to or an unreasonable application of clearly established federal law. <u>Bailey v. Rae</u>, 339 F.3d 1107, 1112-13 (9th Cir. 2003). Here, the Fresno County Superior Court reached the merits of Petitioner's claims. As both the California Court of Appeal and the California Supreme Court summarily denied Petitioner's claims, the Court looks through those decisions to the last reasoned decision; namely, that of the Fresno County Superior Court. <u>See</u> <u>Nunnemaker</u>, 501 U.S. at 804.

**III.     Review of Petitioner's Claims**

Petitioner claims the Board violated his due process rights because the Board relied on Petitioner's old psychological evaluations, and immutable factors such as Petitioner's commitment offense, prior criminal history, and prior 115s. Petitioner contends that the Board's decision was arbitrary and capricious because the Board failed to base its decision on a preponderance of the

evidence.[3]

### A.   Legal Standard for Denial of Parole

The Court analyzes Petitioner's due process claims in two steps: "the first asks whether there exist[s] a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Sass, 461 F.3d at 1127.  The United States Constitution does not, by itself, create a protected liberty interest in a parole date.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).  The Ninth Circuit Court of Appeals has recognized that "[i]f there is any right to release on parole, or to release in the absence of some evidence of future dangerousness, it has to arise from substantive state law creating a right to release." Hayward, 603 F.3d at 555.  The Ninth Circuit further recognized that "[t]here is no general federal constitutional 'some evidence' requirement for denial of parole, in the absence of state law creating an enforceable right to parole." Id. at 559.  The Hayward court's finding, that there exists no free standing federal due process right to parole or the federal right to some evidence of current dangerousness, contained the consistent and continual caveat that state law may in fact give rise to federal protection for those rights.  As the Ninth Circuit later reiterated, "state created rights may give rise to liberty interests that may be enforced as a matter of federal law." Pearson v. Muntz, 606 F.3d 606, 609 (9th Cir. 2010) (per curiam) (citing Wilkinson v. Austin, 545 U.S. 209, 221 (2005)).  The Pearson court found that, "Hayward necessarily held that compliance with state requirement is mandated by federal law, specifically the Due Process Clause" as "[t]he principle that state law gives rise to liberty interests that may be enforced as a matter of federal law is long-established." Id.

The next question is whether California's parole scheme gives rise to a liberty interest enforced as a matter of federal law.  The Ninth Circuit has definitively concluded that "California has created a parole system that independently requires the enforcement of certain procedural and substantive rights, including the right to parole absent 'some evidence' of current dangerousness."

---

[3] Petitioner argues that the Minnesota Supreme Court held in Carillo v. Fabian that a hearing panel's decision must be based on a "preponderance of the evidence." Petitioner's argument is unavailing as this Court is not bound by Minnesota authority.  Under California authority, a denial of parole must be supported by "some evidence." In re Rosenkrantz, 29 Cal. 4th 616, 657-58 (2002).

Id. at 611 (citing Hayward, 603 F.3d at 562); see also Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010) (noting that "California's 'some evidence' requirement is a component of the liberty interest created by the parole system of that state"). The inquiry that a federal habeas court must undertake in determining whether the denial of parole comports with the requirement of federal due process is "whether the California judicial decision approving the governor's [or parole board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 563 (quoting 28 U.S.C. § 2254(d)(1)-(2)) (footnotes omitted). Thus, the inquiry the Court must now undertake is whether the Fresno County Superior Court's decision was an unreasonable application of California's "some evidence" standard.

### B. Superior Court Decision

The Fresno County Superior Court concluded that there was "some evidence" pursuant to In re Lawrence, 44 Cal. 4th 1181, 1227 (2008) to support the Board's decision that Petitioner currently poses an unreasonable risk of danger to society if released. See Petition Exhibit E at 2-4. The Superior Court found that the following factors indicated that Petitioner posed an unreasonable risk of danger to society: (1) the violent nature of Petitioner's commitment offense; (2) Petitioner's history of serious disciplinary violations; (3) Petitioner's lack of efforts in treating his alcohol dependence problems; and (4) Petitioner's failure to gain insight into the causative factors of the commitment offense. Id.

The Superior Court applied the correct standard of review. The California Supreme Court held in Lawrence that, "[t]he relevant determination for the Board and the Governor is, and always has been, an individualized assessment of the continuing danger and risk to public safety posed by the inmate." Lawrence, 44 Cal. 4th at 1227 (noting that "mere recitation of the circumstances of the commitment offense, absent articulation of a rational nexus between those facts and current dangerousness, fails to provide the required "modicum of evidence" of unsuitability"). "[A] reviewing court must consider 'whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor.'" Cooke, 606 F.3d at 1214 (emphasis in original) (quoting Lawrence, 44 Cal. 4th at 1221).

As the Ninth Circuit observed in Cooke:

> Under California law, "the paramount consideration for both the Board and the Governor" must be "whether the inmate currently poses a threat to public safety and thus may not be released on parole, "[citation], and "the facts relied upon by the Board or the Governor [must] support the ultimate decision that the inmate remains a threat to public safety.

Id. (quoting Lawrence, 44 Cal. 4th at 1210, 1213); see also Cal. Code Regs. tit. 15, § 2402(a) ("[I]f in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison," the prisoner must be found unsuitable and denied parole). Here, the Superior Court considered whether there was "some evidence" of current dangerousness. The Court's review of the record reveals that the evidence cited by the Superior Court is sufficient to satisfy the "some evidence" standard.

## C. Commitment Offense and Prior Criminal History

Petitioner challenges the Board's reliance on his commitment offense and prior criminal history. As the Superior Court noted, however, the Board did not just rely on Petitioner's commitment offense and prior criminal history. As discussed more fully below, the Board also relied on Petitioner's serious disciplinary history and Petitioner's insufficient alcohol dependence treatment.

## D. Petitioner's Disciplinary History

Petitioner challenges the Board's reliance on his disciplinary history on the basis that the 115s are old. The Board focused on Petitioner's most recent violation, which occurred in May 2001, where Petitioner was found to have manufactured and possessed a stabbing instrument.[4] See Transcript at 69. The Board also noted that Petitioner received a 115 in August 2000 for refusing to obey orders. Id.

California Parole regulations list institutional behavior as one of the factors the Board considers in determining whether the prisoner poses a current risk of danger to public safety. See Cal. Code Regs. tit. 15, § 2402(c)(6). Institutional behavior, defined as "[t]he prisoner has engaged in serious misconduct in prison or jail," is a circumstance tending to show parole unsuitability. Here, Petitioner's disciplinary history was properly considered by the Board as "some evidence" of current

---

[4] In its decision, the Board noted that Petitioner denies making the stabbing instrument, nevertheless the Board stated that Petitioner was found guilty of manufacturing and possessing the stabbing instrument. See Transcript at 69.

1 dangerousness in light of the following: (1) Petitioner's May 2001 serious disciplinary violation
2 occurred within the last six years of Petitioner's Board hearing; and (2) as the Superior Court noted,
3 Petitioner's possession of the stabbing weapon "tended to show that Petitioner may still have a
4 tendency to arm himself and behave violently." See Respondent Exhibit 2 at 4.

### E.  Insufficient Alcohol Abuse Treatment

Petitioner argues that the Board may not deny parole based on a petitioner's history of substance abuse under Thompson v. Davis, 295 F.3d 890, 898 (9th Cir. 2002). Thompson, however, is not helpful to Petitioner as the Thompson Court did not hold that a parole board cannot consider a prisoner's insufficient substance abuse treatment in a parole suitability hearing. The Ninth Circuit noted:

> [t]he parole board undeniably has a legitimate penological interests in considering the plaintiffs' substance abuse backgrounds during the individualized inquiry for parole suitability. We hold only that plaintiffs may state a claim under Title II based on their allegations that the parole board failed to perform an individualized assessment of the threat they pose to the community by categorically excluding from consideration for parole all people with substance abuse histories.

See Thompson, 295 F.3d 890 at 898 n.4. Accordingly, because the Thompson Court did not address a board's reliance on the insufficiency of a prisoner's specific substance abuse treatment and given that Petitioner is not pursuing a Title II claim, Thompson has no bearing in this matter.

The Board found that Petitioner's insufficient alcohol abuse treatment weighed against finding Petitioner suitable for parole. The Superior Court noted the following:

> [Petitioner's] psychological reports also stated that Petitioner has denied that he has an alcohol problem even though alcohol clearly played a role in the crime. (Ibid.) Furthermore, the Board was concerned that petitioner had not attended Alcoholics Anonymous in about ten years and had not taken any steps to treat his alcohol abuse problem. (Id. at p. 8). In addition, the Board observed that petitioner had a prior criminal record of driving under the influence and other traffic citations, which also supports the concern that he has an alcohol problem . . .

See Respondent Exhibit 2 at 4. There is "some evidence" in the record to support the Board's finding of current dangerousness with respect to Petitioner's inconsistent substance abuse treatment in light of the following: (1) Petitioner testified that he was under the influence of alcohol at the time of the commitment offense and that alcohol was the cause of the offense (see Transcript at 48, 55, 57; (2) Petitioner denies that he currently has an alcohol abuse problem (see Transcript at 56); (3) Petitioner's participation in Alcoholics Anonymous ("AA") was limited to three months during his

fourteen-year incarceration period[5] and Petitioner testified that he does not practice the twelve steps (see Transcript at 55, 56); and (4) Petitioner's prior criminal record, which includes alcohol-related offenses.

Accordingly, the Superior Court's finding that Petitioner's inconsistent substance abuse treatment is probative of Petitioner's current dangerousness is supported by "some evidence," and there is a rational nexus between the evidence cited by the Board and Petitioner's risk of danger if released in light of the significant role that alcohol played in Petitioner's commitment offense.[6]

## **CONCLUSION**

The Board relied on several factors in determining that Petitioner was unsuitable for parole, including Petitioner's commitment offense, insufficient alcohol abuse treatment, and recent serious disciplinary history. The Court cannot find that the Superior Court's determination that the Board's decision is supported by "some evidence" was objectively unreasonable. Therefore, Petitioner is not entitled to habeas corpus relief.

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides that a circuit judge or judge may issue a certificate of appealability where "the applicant has made a substantial showing of the denial of a constitutional right." Where the court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 326; Slack v. McDaniel, 529 U.S. 473,

---

[5] Petitioner testified that he has been on a waiting list for AA since 2006. Petitioner does not dispute that he has not participated in AA between 1993-2006 with the exception of a three-month attendance period.

[6] Although the Board also relied on Petitioner's alleged lack of insight, the Court does not review this factor for "some evidence" as it was not necessary for the Court to reach its decision. The Court notes, however, that the Board appears to rely on Petitioner's 1996 psychological evaluation in determining that Petitioner lacked insight and refused to take responsibility for his actions. See Transcript at 70. The parties did not provide any psychological reports. To the extent the Board relied on the 1996 psychological evaluation in determining that Petitioner lacked insight, the Court fails to see how a ten-year old evaluation would be probative of Petitioner's level of insight at the time of his 2007 parole hearing.

484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338. In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable; thus Petitioner's claim is not deserving of encouragement to proceed further. Consequently, the Court hereby recommends that Petitioner be DENIED a certificate of appealability.

## **RECOMMENDATION**

Accordingly, the Court RECOMMENDS that:

(1) The petition for writ of habeas corpus be DENIED WITH PREJUDICE;

(2) the Clerk of the Court be DIRECTED to enter judgment for Respondent; and

(3) A Certificate of Appealability be DENIED.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) *court* days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   December 8, 2010**         /s/ John M. Dixon
                                UNITED STATES MAGISTRATE JUDGE